UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KACIE W., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:20 cv 1560 JMB |
| ) | |
| KILOLO KIJAKAZI, ) | |
| Acting Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On July 10, 2017, plaintiff Kacie W. filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, alleging a disability onset date of January 5, 2016 due to major depressive disorder, ADHD, avoidant personality disorder and hernias (Tr. 75, 179). After plaintiff's application was denied on initial consideration (Tr. 75-86; 88-91), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 92-93).

Plaintiff and counsel appeared for a hearing on November 13, 2019. (Tr. 34-63). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Dr. Darrell Taylor. The ALJ issued a decision denying plaintiff's application on January 14, 2020. (Tr. 12-33). The Appeals Council denied

plaintiff's request for review on September 2, 2020.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Applications and Hearing Testimony

Plaintiff was born in August 1980 and was 35 years old on the alleged onset date.  (Tr. 44). She lives in a house with her husband and four foster children, ages 19, 4, 3, and 2 (as of January, 2020), who have lived with her since April and June, 2018.  (Tr. 19, 44-45, 52).  She graduated from high school and attended a vocational program in early childhood development.  (Tr. 235). She held a number of full-time jobs as a security guard (driving an armored truck), truck driver, and, most recently, cashier.  (Tr. 224; 253-255).   She left her cashier position for a number of reasons; her husband transferred jobs to a different state (they moved from Illinois to Cuba, Missouri in January, 2017) and she had "too many demerits" because of her negative interactions with customers.  (Tr. 45).

Plaintiff listed her disabling impairments as major depressive disorder, ADHD, avoidant personality disorder and hernias.  (Tr. 179).  She described one hernia as the size of a grapefruit and another the size of an apple.  (Tr. 46-7).  The larger hernia caused her constant pain while the other was painful after walking for more than 45 minutes to an hour and bending over (Tr. 47-8). She takes Ibuprofen and Tylenol for her pain and it helps most of the time (Tr. 48).   Her ADHD and personality disorder cause her to be impulsive and lose control of her temper.  (Tr. 51).  Her ADHD also causes an inability to complete tasks.  (Tr. 53).  She takes Adderall for ADHD, Trazadone for depression, and Buspar for anxiety.  (Tr. 53-54).

Vocational expert Dr. Taylor testified that plaintiff's past work in the cashier and security guard positions were classified as light exertional and semi-skilled and her work as a truck driver

was medium exertional and semi-skilled.  (Tr.  59).  Dr. Taylor was asked to testify about the employment opportunities for a hypothetical person who is younger with at least a high school education and plaintiff's past work experience, who is limited to light work involving no climbing ladders, ropes, or scaffolds, and no more than occasional stooping, kneeling, crouching, or crawling.  In addition, the individual can attend to and carry out routine and repetitive tasks, occasionally interact with the public, and have no more than superficially interact with coworkers with no tandem or group work.  (Tr. 59).  According to Dr. Taylor, such an individual would be unable to perform plaintiff's past work.  However, other light, unskilled work was available in the national economy, such as cleaner, hand-packer, and production worker.  (Tr. 60).

Dr. Taylor was also asked to testify about employment opportunities if the hypothetical person had additional restrictions; can lift no more than 10 pounds occasionally and no more than 5 pounds frequently, can stand or walk for 6 hours and sit for 6 hours in an 8 hour work day with customary breaks.  Dr. Taylor testified that these changes would limit the amount of light work available but would allow for a full range of sedentary work.  (Tr. 60-1).  These jobs include sedentary, unskilled hand packer, production worker, and inspector/tester/sorter.  Each of the jobs identified by Dr. Taylor are contained in the Dictionary of Occupational Titles (DOT).  (Tr. 59-61).  In each of these positions, Dr. Taylor noted that an employee could not be off task for more than 10% of the work day.  (Tr. 61).

    B.   **<u>Medical and Opinion Evidence</u>**

In February 2015 plaintiff underwent surgery to repair two ventral incisional hernias.  (Tr. 337-340).  The surgery was performed by Dr. Amanda Dick who indicated that there were no complications and that plaintiff felt well after the surgery.  (Tr. 335-340).  Dr. Dick noted that plaintiff could return to work without restriction by April 14, 2015.  (Tr. 331-332).  Plaintiff

returned to Dr. Dick on December 22, 2015 complaining of discomfort and swelling and a possible recurrent ventral hernia. (Tr. 349-351). Dr. Dick found a possible small hernia defect that appeared reducible and indicated that plaintiff wanted to wait until the following year to schedule a CT scan to evaluate her abdominal wall. (Tr. 351). Plaintiff's hernias are not mentioned again in the medical records until she began treatment with Dr. Felipe Eljaiek in 2017. On September 28, 2017, she was instructed to monitor her hernias and avoid lifting; she also was counseled to lose weight and exercise to manage her morbid obesity. (Tr. 412-415). On March 1, 2019, plaintiff sought treatment for abdominal pain; Dr. Eljaiek noted two unobstructed hernias, one umbilical and the other ventral, and she was directed to consult with another doctor. (Tr. 454). Two weeks later, she went to the emergency room with abdominal pain after lifting an 18-pound child. (Tr. 498). It was noted that she reported "moderate to severe discomfort with movement but was able to transfer herself from the ambulance stretcher to the ED bed without difficulty." (Tr. 499). She was discharged with instructions to return if the pain worsened and to follow up with her primary care physician. (Tr. 501).

Plaintiff initially sought care for her mental health on August 15, 2016 when she was prescribed Adderall by Dr. Salma Hillaly for a childhood diagnosis of ADD. (Tr. 494). On February 23, 2017, she established care with Dr. Eljaiek who found her to have normal mood and affect, behavior, judgment and thought content. (Tr. 388). He did not refill her Adderall prescription but directed a psychological evaluation. (Tr. 386-388). She was evaluated on June 21, 2017, by Dr. Bonny Thacker who found her to be cooperative, fully oriented to person, place, and time, easy to understand, sitting still, and giving her best effort. (Tr. 366). Her mood was appropriate, she did not appear depressed and had an appropriate affect, her thought process was linear and she stayed on task, she displayed adequate memory and attention and did not exhibit

impulsive behavior.  (Tr. 366-7).  After performing various assessments, including the Wechsler Intelligence Scale for Adult-Fourth Edition (for which she maintained her focus and concentration) and the MMPI-2-RF (to assess personality functioning), the BDI-II (to assess depression), the Trial Making Tests (to assess attention and orientation), and the CAARS (to assess ADHD), Dr. Thacker found that she exhibited symptoms of ADHD with attention and hyperactivity, and that she struggles with "switching her attention and maintaining her focus on multiple stimuli at the same time," among behaviors.  (Tr. 369-370).  She diagnosed her with major depressive disorder, unspecified anxiety disorder, ADHD, and avoidant personality disorder and recommended therapy and medication.  (Tr. 364-371).  Dr. Eljaiek followed up with plaintiff after the evaluation and found her to be nervous and anxious; but as in the previous examination, she was oriented to person, place and time, alert, had normal mood and affect, behavior, judgment and thought content.  (Tr. 382).  Dr. Eljaiek prescribed Concerta for ADHD and Zoloft for depression.  (Tr. 382).

Thereafter, plaintiff followed up with Dr. Eljaiek on July 21, 2017, September 28, 2017, August 22, 2018, and March 1, 2019 for her mood disorders.  At each of those appointments (and other appointments for additional unremarkable medical care), she sometimes appeared nervous and anxious but generally had normal neurological and psychiatric findings.  On July 21, 2017, her medications were continued, although her Zoloft was increased.  (Tr. 379).  She received further evaluation for her mood disorders from Dr. Bhaskar Gowda starting on November 1, 2018. (Tr. 468-486).  Dr. Gowda noted that she was cooperative, maintained good eye contact, had goal directed thoughts and an appropriate affect, had good immediate and remote memory, insight, and judgment. (Tr. 470-471).  However, she reported poor attention and concentration, forgetfulness, and lack of energy. (Tr. 468-471).  Dr. Gowda prescribed Adderall for ADHD and she was referred to a mental health team to follow up on depression.  (Tr. 471).  At her next appointment on January

14, 2019, she noted that she felt better with Adderall; she completed housework, took care of 4 children, completed tasks, had energy and motivation. (Tr. 473). She was directed to continue Adderall and Trazadone. (Tr. 475). On May 13, 2019, plaintiff reported feeling anxious about the graduation of one foster child and the presence of the child's birth mother. (Tr. 477). As with the January, 2019 visit, she was feeling better with medication; with no signs of depression or anxiety. (Tr. 477). Her medications were continued. In the final record of medical care, dated August 5, 2019, plaintiff again reported anxiety as to her foster children but was again feeling better and more capable with medication. (Tr. 482). Her medication was continued, with the addition of Buspar, and she was directed to follow up in 12 weeks. (Tr. 485).

Agency physician Dr. Steven Akeson completed a Residual Functional Capacity (RFC) assessment and found that plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods of time and interact appropriately with the general public. (Tr. 83-84). By way of explanation, he indicated that:

> The claimant retains the ability to understand and remember complex information. She can carry out complex instructions but would likely be able to sustain simple to moderately complex tasks. She can maintain adequate attendance and sustain an ordinary routine without special supervision. The claimant can interact adequately with peers and supervisors in a work setting where demands for social interaction are not primary job requirements. She would do best with limited to moderate public contact. The claimant can adapt to most changes in a competitive work setting. (Tr. 84).

Treating doctor Dr. Gowda filled out a Medical Source Statement setting forth his opinions about plaintiff's ability to perform work. (Tr. 528-529). He found that plaintiff is markedly limited in

almost all categories of sustained concentration and persistence and moderately limited in other categories including adaptation. (Tr. 529).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing

20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." Id. Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734,

738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 15-28). The ALJ found that plaintiff met the insured status requirements through December 30, 2020, and had not engaged in substantial gainful activity since January 5, 2016, the alleged onset date. (Tr. 17-18). At step two, the ALJ found that plaintiff had the severe impairments of ventral hernia, morbid obesity, ADHD, avoidance disorder, anxiety, and major depressive disorder. (Tr. 18). The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ specifically addressed listings 12.04, 12.06, 12.08, and 12.11 in considering plaintiff's mental

impairments and found that: plaintiff only had mild and not extreme or marked limitations in functioning independently, appropriately, or effectively on a sustained basis, and adapting or managing herself.  (Tr. 18-19, 20); and, she had moderate limitations in interacting with others, with concentrating, persisting and maintaining pace.  (Tr. 19).  Plaintiff does not challenge the ALJ's assessment of her severe impairments or the determination that plaintiff's impairments do not meet or equal a listing.

The ALJ next determined that plaintiff had the RFC to perform light work, except that she cannot climb ladders, ropes, or scaffolds, and can occasionally stoop, kneel, crouch, and crawl. She could attend to and carry out routine and repetitive tasks and she can have occasional interaction with the public and superficial interaction with co-workers.  (Tr. 21).  In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from plaintiff; plaintiff's work history; and plaintiff's testimony regarding her abilities, conditions, and activities of daily living.  (Tr. 21-26).

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work.  (Tr. 26).  He found that her age on the alleged onset date placed her in the "younger individual" category and that she had a high school education and was able to communicate in English.  Id.  The transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that plaintiff was not disabled whether or not she had transferable job skills.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as a cleaner, hand packer, and production worker.  (Tr. 26-27). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from January 5, 2016 through January 17, 2020 — the date of the decision.  (Tr. 27-28).

## V. Discussion

Plaintiff argues that the RFC is not supported by substantial evidence because it did not include all of plaintiff's limitations, most notably, her inability to adapt to changes in the workplace. She further argues that the ALJ erred in concluding that she could perform light work because he did not properly take into consideration her medical conditions including ventral hernias and morbid obesity. In particular, she argues that her medical records and other evidence support a finding that she has difficulty regulating her emotions, controlling behavior, maintaining well-being in the workplace, and lifting.[1]

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184 (July 2, 1996). As the Eighth Circuit has stated, "the RFC determination is a 'medical question,' that must be supported by some medical evidence of [plaintiff's] ability to function in the workplace.'" Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (citations omitted). "But, the RFC is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." Id. (citation and parenthetical omitted). "[A]lthough medical source opinions

---

[1] 20 C.F.R., Part 404, Subpt. P, App'x1, 12.00 describes mental disorders with paragraph A of each listing describing medical evidence and paragraph B describing functional criteria that are considered by the SSA. The paragraph B criteria highlighted by plaintiff is:

> 4. Adapt or manage oneself (paragraph B4). This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

are considered in assessing RFC, the final determination of RFC is left to the Commissioner, . . . based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." Id. at 744-45 (citations omitted). "Similarly, the underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints. Rather, regulations set forth assorted categories of evidence that may help shed light on the intensity, persistence, and limiting effects of symptoms." Id. at 745 (footnote and citations omitted). Similar factors guide the analysis of whether a claimant's subjective complaints are consistent with the medical evidence. Id. (footnote, citation, and parenthetical omitted). Ultimately, the claimant is responsible for providing evidence relating to his or her RFC and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." Turner v. Saul, No. 4:18 CV 1230 ACL, 2019 WL 4260323, at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

Plaintiff first argues that the ALJ's RFC determination did not address Dr. Akeson's assessment that plaintiff "can adapt to most changes" even though he found Dr. Akeson's RFC persuasive; did not specifically discuss why Dr. Gowda's assessment, in particular that plaintiff is moderately limited in adaptation, was unpersuasive; and failed to consider plaintiff's and her husband's own assessment of her activities of daily living. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). Contrary to plaintiff's suggestion, however, there is no requirement that the ALJ address all limitations assessed by a medical source, even if the source is found to be persuasive. McCoy v. Astrue, 648

F.3d 605, 615 (8th Cir. 2011) (in making an RFC determination, "we do not require an ALJ to mechanically list and reject every possible limitation."); see also Cannady v. Colvin, 2015 WL 139762, at *5 (W.D. Mo. Jan. 12, 2015) (ALJ not required to adopt all limitations proposed by a medical source, even if the ALJ affords significant weight to the source's opinion); McGee v. Colvin, 2015 WL 58484, at *4–5 (W.D. Mo. Jan. 5, 2015) ("An ALJ is not required to refute every alleged limitation."). Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC. Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original). Thus, to the extent that plaintiff argues that the ALJ did not address every specific limitation contained in Dr. Akeson's or Dr. Gowda's assessment of plaintiff's functional limitation, her argument is not persuasive. As reviewed below, the medical record provides a substantial basis for the RFC.

In his determination, the ALJ stated that plaintiff only had a mild limitation in adapting and managing oneself. (Tr. 20). The ALJ found persuasive Dr. Akeson's assessment that plaintiff could adapt to most changes in a competitive work environment and relied on her "predominately normal mental status examinations" and her ability to complete household chores and manage her four children. (Tr. 25). Contrary to plaintiff's argument, the ALJ did not craft an RFC that was inconsistent with Dr. Akeson's assessment – rather it was consistent with his findings that she could adapt to most changes in a work environment.

The ALJ found Dr. Gowda's entire assessment unpersuasive and highlighted why he believed the conclusions as to concentration and persistence were particularly unpersuasive. He found that Dr. Gowda's entire assessment, which is a check-boxed form, was inconsistent with his treatment notes. See Grindley v. Kijakazi, 9 F.4th 622, 632 (8th Cir. 2021) (noting that a "check-

box" form that does not allow for explanation can be afforded no weight because it contains only conclusory statements). In particular, Dr. Gowda noted that plaintiff could complete housework, manage four foster children (three of whom were under the age of 4 at the time of Dr. Gowda's assessment), complete her tasks, that her attention was "much better" in August, 2019, and that she presented at appointments with normal mental status examinations and only situational anxiety. (Tr. 24-25). Moreover, the ALJ found that plaintiff's mental health symptoms were managed with medication as set forth in her medical records. (See, e.g., Tr. 20, 387 (noting that medication helped her stay on task)). As to the other areas of adaptation that plaintiff did not highlight but that the regulations consider, the ALJ found no evidence that plaintiff was unable to maintain her own hygiene or be aware of and manage normal hazards; that she was capable of functioning independently; that while she indicated she could not manage stress or changes, was able to care for her "quite young" foster children; and that (from the medical records) she had a normal mood and affect. (Tr. 20). Consideration of plaintiff's daily activities that refute Dr. Gowda's assessments is entirely proper. See Thomas v. Berryhill, 881 F.3d 672, 676 (8th Cir. 2018) (noting that the ALJ could discredit a treating doctor's assessment by considering a claimant's abilities including caring for a young child, preparing meals, and doing housework, among other things). Finally, unlike the situation in Gann v. Berryhill, 864 F.3d 947 (8th Cir. 2017), the ALJ was not required to include in his RFC a limitation advocated by a treating physician that he found unpersuasive.[2]

---

[2] In that case, two treating physicians found that the plaintiff's ability to adapt was "highly marginal" and "moderately limited" by her medical condition. The ALJ found the opinions of these medical providers credible and gave them significant weight but did not include their assessment of adaptation in the hypothetical posed to the vocational expert. The Court reversed, finding that a vocational expert "cannot accurately assess the claimant's job prospects unless the hypothetical question comprehensively describes the claimant's limitations." Id. at 952.

Next, plaintiff argues that the ALJ failed to consider her own statements of functional limitations or that she needed assistance with her activities of daily living. In his opinion, the ALJ acknowledged that plaintiff required assistance with various activities including caring for her foster children and remembering certain tasks. However, the ALJ also found that testing showed her memory to be average, that she has frequent social interactions, that she was cooperative with treatment providers and able to answer questions appropriately, that she reported being able to stay on task with medications, that she was able to adequately concentrate during psychological testing, that she can live independently, and that she had linear thought processes. (Tr. 19-20, 23). Thus, the medical records do not support the type of limitations in activities of daily living that plaintiff (and her husband) offered. Again, the ALJ was not required to address every type of limitation that plaintiff highlighted in her statements or in her testimony. See Sloan v. Saul, 933 F.3d 946, 951 (8th Cir. 2019) (noting that if the agency's reasoning is clear, a deficiency in opinion-writing is insufficient to set aside the agency's conclusion). The ALJ appropriately considered whether the medical evidence supported the severity of the limitations advocated by plaintiff in making his RFC assessment. Moreover, by crafting an RFC that allowed for only light work with routine and repetitive tasks and only occasional interaction with the public and superficial interactions with co-workers, the ALJ accounted for plaintiff's psychological symptoms that are supported by the medical record.

Finally, plaintiff argues that the ALJ did not adequately address her physical limitations. related to her hernias and morbid obesity, which include limitations on lifting. The ALJ found that plaintiff's ventral hernia and morbid obesity were severe impairments but that the medical evidence did not support the functional limitations advocated by plaintiff. He noted that while plaintiff indicated that she cannot walk for more than an hour without rest or lift a gallon of milk,

she received limited treatment for her hernias and the pain she reported during her emergency room visit in March, 2019 was due to a particular activity and may have been related to her gallbladder rather than any hernia. (Tr. 23). He also accounted for functional limitation associated with these conditions by finding that plaintiff has the RFC to perform light work.

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints.[3] Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). In doing so, the ALJ must consider the claimant's prior work record and third-party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is not mechanically obligated to discuss each of the above factors, however, when rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his or her reasons for discrediting the testimony, and the ALJ's credibility assessment must be based on substantial evidence. Vick v. Saul, No. 1:19 CV 232 CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Grba-Craghead v. Astrue, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)). On review by the court, "[c]redibility determinations are the province of the ALJ." Nash v. Comm'r, Soc. Sec. Admin., 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016)). The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility." Id.

---

[3] Social Security Ruling 16-3p eliminated the term "credibility" from the analysis of subjective complaints. However, the regulations remain unchanged; "Our regulations on evaluating symptoms are unchanged." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929.

Here, the ALJ determined that, although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 22, 25).  At the hearing, plaintiff testified that she suffered constant pain from her hernias, that she has pain from walking and bending over "too much," and that she feels "achy " from being on her feet for more than 30 minutes.  (Tr. 47-48).  She further testified that most of the time her pain is managed by Tylenol and ibuprofen.  (Tr. 48).  She also reported that she can lift no more than 5 pounds and that she could only walk for 5-10 minutes before needing to rest for 15 minutes.  (Tr. 269).  Plaintiff argues that the ALJ failed to consider these statements and that he should have taken into account Dr. Eljaiek's assessment and plan on September 28, 2017 that she should "monitor hernias and avoid lifting."  (Tr. 415).

Contrary to plaintiff's argument, the ALJ did specifically consider Dr. Eljaiek's September 28, 2017 assessment by noting that "the claimant did not report any ongoing or current hernia symptoms" thereafter.  (Tr. 22).  He noted that she then complained of abdominal pain in March, 2019 (i.e., 18 months later), and she was directed to follow up with another doctor (the Court notes that Dr. Eljaiek did not prescribe any medications or functional limitations at that visit).  (Tr. 22, 457-458).  See Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015) (finding that the ALJ could consider conservative treatment and significant gaps in care in assessing a claimant's alleged disabling conditions).  He further noted that, when she sought emergency care that same month, her pain was the result of a particular act (lifting an 18-pound child), may have been related to a gallbladder issue instead of hernias, and that she was "discharged in good condition."  (Tr. 22).  Finally, the ALJ considered that plaintiff's obesity would contribute to functional limitations and took that into account in fashioning the RFC.  Based on the limited treatment records and

conservative care, the ALJ found that the medical records did not support the restrictive functional limitations that plaintiff suggested and found that she could lift no more than 20 pounds occasionally and 10 pounds frequently.[4]  See Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 at *9 (S.S.A. Oct. 25, 2017) ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

## VI.  Conclusion

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of April, 2022

---

[4] As noted above, with additional restrictions on lifting, vocational expert Dr. Taylor indicated that a full range of sedentary work remained available.  Therefore, even if the ALJ erred in finding that plaintiff could perform light work, the error may be harmless.  See, e.g., Skunkwiler v. Saul, 2021, WL 1516417, *8 (E.D. Mo. 2021).